1

2

3                                    *FOR PUBLICATION*

4

5

6                    **UNITED STATES BANKRUPTCY COURT**
                      **EASTERN DISTRICT OF CALIFORNIA**

7

8
   In re                              )     Case No.   21-23841-E-13
9                                     )
   DENNIS A. FRAZIER,                 )
10                                    )
                    Debtor.           )
11  _____  )
                                      )
12  FIRST TRUST,                      )     Adv. Proc. No.  22-2008
                                      )
13                  Plaintiff,        )
                                      )
14  v.                                )
                                      )
15  DENNIS A. FRAZIER,                )
                                      )
16                  Defendant.        )
   _____   )
17

18                       **MEMORANDUM OPINION RE**
         **COMPLAINT TO DETERMINE EXTENT, VALIDITY, AND  AMOUNT**
19    **OF INTEREST IN REAL PROPERTY AND OBLIGATION SECURED THEREBY**
                                 **AND**
20                 **FOR NONDISCHARGEABILITY OF DEBT**

21          The court has been presented with a very interesting Complaint which is a good example of

22  the broad range of State Law issues presented in Bankruptcy Court for adjudication by a Federal

23  Judge.   The Plaintiff, Carl Dexter, in his capacity as Trustee of First Trust,[1] ("Plaintiff-

24  _____

25          [1]  At the trial Carl Dexter testified that he is the Trustee of First Trust, and that First Trust is a
    "business trust," and not a limited liability company, corporation, or other entity.  As established under
26  California and Federal Law and Rules, when a trust is a party to litigation, it is the trustee of the trust who
    is the named party, as trustee, and not the trust as an entity.  *See,* Fed. R. Civ. P. 17(a)(E), requiring the
27  "trustee of an express trust, to be the real party in interest to bring suit asserting rights of a trust; Fed. R.
    Bankr. P. 9017, and 4 MOORE'S FEDERAL PRACTICE - CIVIL § 17.10.  *See also*, Cal. C.C.P. § 369(a),
28  *Moeller v. Superior Court*, 16 Cal. 4th 1124, 1134 n. 3 (1994), *Presta v. Tepper*, 179 Cal. App.4th 909,
    914 (Cal. App. 2009), and 60 Cal. Jur.3d, Trusts § 355.

Trustee")[2] has filed a complaint seeking to enforce rights and interests arising pursuant to the Foreclosure Cancellation  Guaranty Contract (Exhibit 2; referred to herein as "Foreclosure Cancellation Guaranty" or "Contract")  and a Deed of Trust (Exhibit 4; "Deed of Trust") recorded against real property commonly known as 2 Odom Court, Sacramento, California (the "Residence"). Dennis Frazier, the Defendant-Debtor, ("Defendant-Debtor"), who is the other party to the Foreclosure Cancellation Guaranty, strongly opposes the Complaint.  Defendant-Debtor opposes the requested relief by Plaintiff-Trustee that the court determine that: (1) pursuant to the Foreclosure Cancellation Guaranty Plaintiff-Trustee is a 50% joint venture owner of the proceeds from the immediate sale of Defendant-Debtor's Residence and (2) Defendant-Debtor's financial obligations to Plaintiff-Trustee pursuant to the Foreclosure Cancellation Guaranty are nondischargeable.

## REVIEW OF TESTIMONY, FINDINGS OF CREDIBILITY,
### AND
## FACTUAL DETERMINATIONS BY THE COURT

For the contract at issue in this Adversary Proceeding, the Foreclosure Cancellation Guaranty, the events leading up to the litigation relate to events similar to what many other consumers have suffered in the past several years – Defendant-Debtor defaulting on the loan secured by his Residence and then the default balance increasing during the COVID-19 period of mortgage foreclosure and enforcement moratoria.  Most of the facts are not in dispute, however, there is testimony regarding some facts for which the court is required to expressly address the credibility of the witnesses providing the testimony.

It is not in dispute that Defendant-Debtor owns and has owned his Residence for all periods

---

In open court on April 26, 2023, at a hearing called by the undersigned judge, the court addressed with the respective counsel the correct identification of the real party in interest Plaintiff – that being Carl Dexter, Trustee of First Trust, and not the Trust itself as named in the Complaint. As discussed with the respective counsel for the Parties in this Adversary Proceeding in open court, the Parties consenting on the record, and considering the real party in interest prosecuting the Complaint in this Adversary Proceeding, Carl Dexter, as the Trustee of First Trust, has been substituted in as the real party in interest as Plaintiff.  Fed. R. Civ. Proc. 18(a)(1), (3) and Fed. R. Bankr. P. 7018.  Civ. Minutes and Order; Dckts. 51, 52.

[2]  In addressing the rights and interests of First Trust pursuant to the Foreclosure Cancellation Guaranty, the court references "Plaintiff-Trustee," as the party to this Adversary Proceeding for First Trust for the determination of such rights and interests.

of time relevant to this Adversary Proceeding. Defendant-Debtor defaulted on the Freedom Mortgage Loan secured by the Residence, and a Notice of Default was filed with the County Recorder in the Fall of 2019. It is from that default that the relationship between Defendant-Debtor and Plaintiff-Trustee grew and the results thereof are now before the court.

**Testimony of Defendant-Debtor**
**of Work Done by Plaintiff-Trustee**

Defendant-Debtor testified that after the Notice of Default was recorded, a woman came to his door asking whether he wanted to sell the Residence. Defendant-Debtor testified that he told the woman that he did not want to sell, but desired to modify the Freedom Mortgage Loan, cure the default, and keep his Residence. He then further testified that the woman told him she worked with a man who was an attorney, that attorney provided such services to consumers, and that she would have the attorney contact Defendant-Debtor. Though the "attorney" was not identified by the woman, Defendant-Debtor concludes that the "attorney" was and is the Plaintiff-Trustee. This contention is hotly disputed by the Plaintiff-Trustee. There was not sufficient evidence for the court to conclude that Plaintiff-Trustee was the person referred to by the woman. The determination of such fact/contention is not material to the Decision in this Adversary Proceeding.

On October 5, 2019, subsequent to the woman having appeared at Defendant-Debtor's door, Plaintiff-Trustee contacted Defendant-Debtor at the Residence about the default on the Freedom Mortgage Loan and the outstanding arrearage to be cured.

In the Fall of 2019, a series of Chapter 13 bankruptcy cases were filed by or for the Defendant-Debtor, all of which were quickly dismissed by the court for failure to prosecute. The first is Chapter 13 Case 19-24413, which was filed on July 15, 2019, and dismissed on July 26, 2019. The second is Chapter 13 Case 19-25933, which was filed on September 23, 2019, and dismissed on October 4, 2019. The third is Chapter 13 Case 19-27457, which was filed on December 2, 2019, and dismissed on December 20, 2019.

All three of these bankruptcy cases were filed in *pro se*, with no attorney purporting to be representing the Defendant-Debtor. All three were dismissed due to the failure to file the basic documents necessary to proceed with the prosecution of a bankruptcy case, including: the

Chapter 13 Plan, Schedules, Statement of Financial Affairs, and Verification and Master Address List.  *See*, the Notices of Incomplete Filing and Notice of Intent to Dismiss filed in each of the forgoing three bankruptcy cases.

Defendant-Debtor's testimony is that Plaintiff-Trustee was the mastermind behind the filing of the three Chapter 13 Bankruptcy Cases in the Fall of 2019, that Plaintiff-Trustee represented that he was an attorney to Defendant-Debtor, that Plaintiff-Trustee prepared all of the bankruptcy paperwork for the filing of those three bankruptcy cases, that Defendant-Debtor paid $200.00 to Plaintiff-Trustee for filing fees for each of the three bankruptcy cases, and that it was Plaintiff-Trustee who physically went to the Federal Courthouse to file the bankruptcy petitions for those three bankruptcy cases in the Fall of 2019.

Plaintiff-Trustee strongly disputes that he ever represented to the Defendant-Debtor that he was an attorney, and testified that he never did any work, consulting, or advising with respect to the filing of bankruptcy cases by Defendant-Debtor.  The court was not presented with sufficient evidence to find that such representations of being an attorney were made or that Plaintiff-Trustee provided the bankruptcy "representation" or worked on the documents or filing of the three bankruptcy cases in the Fall of 2019.  This failure of evidence to make such determinations does not affect the ability of the court to issue the Decision in this Adversary Proceeding.  However, the court has been presented with substantial testimony and documentary evidence of the substance of the undisputed work done by Plaintiff-Trustee to stop the foreclosure sale and cure the default on the obligation secured by Defendant-Debtor's Residence.

**Testimony of Plaintiff-Trustee Re**
**Loan Made to Defendant-Debtor and**
**Communications with Foreclosing Lender**

In addition to the live testimony at Trial, Plaintiff-Trustee provided his Direct Testimony Statement as required by Local Bankruptcy Rule 9017-1, which he adopted and was admitted into evidence for trial.  That Direct Testimony Statement, Exhibit A after Exhibit 11 of Plaintiff's Exhibits, includes the following testimony under penalty of perjury with respect to how Plaintiff-Trustee  first connected with Defendant-Debtor and his involvement with Defendant-Debtor in the Fall of 2019 relating to the Notice of Default and possible foreclosure (testimony

4

identified by paragraph number used in the direct testimony statement):

> 3. I [Plaintiff-Trustee] first met Dennis Frazier [Defendant-Debtor] in October 5, 2019, at Mr. Frazier's home located as 2 Odom Court, Sacramento, California [the Residence].

> 5. At the time I met [Defendant-Debtor] he informed me that there was a first deed of trust in the amount of $155,000 with Freedom Mortgage (with a reinstatement amount of $37,000.000), . . . .

At trial, Plaintiff-Trustee provides some more information about dealings with Defendant-Debtor, which testimony included (the court stating the testimony it heard at trial, there not being a transcript to cite to):

> a. He first met with Defendant-Debtor in October of 2019. Plaintiff-Trustee testified that he was referred to Defendant-Debtor by "someone else," with that "someone else" never identified by Plaintiff-Trustee.

> b. During the period of October 2019 through January 2022, he met with the Defendant-Debtor more than one time. Plaintiff-Trustee did not testify as to what he did at these meetings or how many more than "one time" he met with Defendant-Debtor. Plaintiff-Trustee was able to testify that he:

> > i. Did not assist with any loan modification, as alleged by Defendant-Debtor;

> > ii. Did not take any money for bankruptcy filing fees; and

> > iii. Did not take any documents to the Bankruptcy Court.

Plaintiff-Trustee was adamant in his testimony that he was not a "Foreclosure Consultant" (as that term is defined and regulated under California Law, which the court addresses below), that he did not provide advice or assistance to Defendant-Debtor with respect to stopping the foreclosure sale or curing the default on Defendant-Debtor's Residence, but that he and his Trust are just "real estate investors."

Plaintiff-Trustee further testified that in the past ten (10) years he has done more than one hundred-fifty (150) transactions like this one and has used the Foreclosure Cancellation Guaranty presented to this court for more than fifteen (15) years. This was for his business that he states was not that of a Foreclosure Consultant.

In his Direct Testimony Statement, Plaintiff-Trustee provides some testimony about what he and the Trust provided under the Foreclosure Cancellation Guaranty. This testimony includes that pursuant to the Foreclosure Cancellation Guaranty, Plaintiff-Trustee made an advance (loan)

of $37,000.00 to stop the Freedom Mortgage foreclosure sale and cure the default on the Freedom Mortgage Loan secured by Defendant-Debtor's Residence. Direct Testimony Statement, ¶¶ 32, 33, 37, 38. The other "actions" taken by Plaintiff-Trustee are identified as those to get Defendant-Debtor's Residence quickly sold and use the proceeds to pay back the $37,000.00 advance, and disburse 50% of the Net Sales Proceeds to Plaintiff-Trustee for having made the $37,000.00 advance. *Id.*, ¶¶ 40, 41, 42, 43, 52.

Plaintiff-Trustee testifies to not only electronically transferring the $37,000.00 advanced (loaned) to cure the default, but also:

> 35. From and after February 11, 2020, I had several discussions with representatives from Freedom Mortgage [the foreclosing lender] wherein I informed them that the $37,000.00 Wire had been transmitted at 9:18 a.m. which was before the Foreclosure Sale was scheduled at 10:00 a.m.
>
> 36. Freedom Mortgage never recorded a trustee's deed upon sale from the Foreclosure Sale, and eventually agreed with me that the $37,000.00 Advance was timely sent prior to the crying of the Foreclosure Sale.
>
> 37. If [Plaintiff-Trustee] had not sent the $37,000.00 Advance, Freedom Mortgage would not have rescinded the Foreclosure Sale.
>
> 38. As a direct result of Plaintiff Delivering the $37,000.00 Advance to Freedom Mortgage on the day of the Foreclosure sale, the [Residence] was "saved" from being foreclosed upon because had the advance not been made, Freedom Mortgage would have recorded the trustee's deed and "wiped out" any interest that [Defendant-Debtor] had in [his Residence].

*Id.*, ¶¶ 35-38.

In this Testimony, Plaintiff-Trustee clearly states that he made an advance, a loan to Defendant-Debtor, of $37,000.00 to stop the pending Freedom Mortgage foreclosure sale on Defendant-Debtor's Residence. Plaintiff-Trustee testifies further, stating that he then engaged in communications (advocacy for Defendant-Debtor) with Freedom Mortgage representative that the default had been cured by the $37,000.00 Advance (loan) and that the Residence had been saved from foreclosure. All of the activities testified to by Plaintiff-Trustee relate to:

- Curing the default on the Freedom Mortgage Loan secured by Defendant-Debtor's Residence,

- Making a loan to cure the default on the Freedom Mortgage Loan secured by Defendant-Debtor's Residence,

•     Stopping the Freedom Mortgage foreclosure sale from being conducted on Defendant-Debtor's Residence,

•     Communicating with Freedom Mortgage representatives for the cure of the default and the reinstatement of the loan secured by Defendant-Debtor's Residence, and

•     Saving Defendant-Debtor's Residence from the Freedom Mortgage foreclosure.

As discussed below, these fall squarely into what are statutorily defined as "services" provided by a Foreclosure Consultant under California Law.

**Findings Regarding the Sophistication and
Credibility of Testimony of Defendant-Debtor
and Plaintiff-Trustee**

Here, Defendant-Debtor was within less than fourteen hours of losing his Residence through the Freedom Mortgage foreclosure sale. Plaintiff-Trustee had been communicating with Defendant-Debtor for several months (the parties dispute the scope of those discussions) prior to entering into the Foreclosure Cancellation Guaranty. Defendant-Debtor had, through his inaction, put himself in a pit of financial despair, ripe for the plucking for Plaintiff-Trustee (a Foreclosure Consultant whose practices are governed by California consumer protection law) to swoop in with his Foreclosure Cancellation Guaranty and try and take-away 50% of Defendant-Debtor's substantial equity ($180,000.00, as computed by Plaintiff-Trustee in the Complaint) in the Residence. If Defendant-Debtor is "guilty" of anything, it is avoidance of reality and being a less sophisticated consumer trying to save his residence property from foreclosure.

What first arose in review of the Direct Testimony Statements, and then became strikingly apparent at Trial, is that the court was presented with testimony by witnesses, for which the credibility of the witnesses was put at issue. The court addresses this for the Plaintiff-Trustee and Defendant-Debtor.

Plaintiff-Trustee

While much of Plaintiff-Trustee's testimony is not credible, the court does find Plaintiff-Trustee to be a highly financially sophisticated person, who has used the legal services of his attorney (a different attorney then represented Plaintiff-Trustee in this Adversary Proceeding) to draft the Foreclosure Cancellation Guaranty and now uses it to prey upon consumers whose homes

are in foreclosure.  Much of Plaintiff-Trustee's testimony were his legal conclusions of what his Foreclosure Cancellation Guaranty was, that the Foreclosure Consultant laws of the State of California did not apply to him, and telling the court to ignore the plain language in the Foreclosure Cancellation Guaranty drafted by Plaintiff-Trustee and his attorney.

The court did not find Plaintiff-Trustee's testimony that he was "under stress" in trying to "save" Defendant-Debtor's home (for which Plaintiff-Trustee was to take half of the equity from the Defendant-Debtor, in addition to being repaid for the loan) to be credible.  Listening to the testimony and watching Plaintiff-Trustee as he testified, the court concludes that he was not under "stress," but was working hard to take unfair advantage of the less sophisticated consumer Defendant-Debtor by acts that violate California Law.

Plaintiff-Trustee is a very sophisticated business person in the areas relating to mortgages, foreclosures, curing defaults, repairing residential properties, and selling residential properties, including a quick turnaround or "flipping" of a residence after making an advance (loan to a consumer owner of a residence in foreclosure) to cure a default.  Plaintiff-Trustee does not merely get repaid the monies advanced and some reasonable interest, but also seeks to take a large cut (here 50%) of the consumer's equity in the residence which has to be immediately listed for sale (within 60 days from the February 11, 2020 contract date) and sold under the Plaintiff-Trustee's Foreclosure Cancellation Guaranty.  Additionally, as the court addresses herein, Plaintiff-Trustee shows a high level of sophistication in now trying to interpret the Foreclosure Cancellation Guaranty and argue that it: (1) does not relate to foreclosures of a consumer's residence, (2) does not relate to cancelling foreclosures and reinstating loans secured by a consumer's residence, and (3) does not relate to a consumer's residence in foreclosure, all in a blatant attempt to circumvent California consumer protection laws.

The court does not find credible that Plaintiff-Trustee cannot "remember" who the person was who referred him to Defendant-Debtor.  The court further does not find it credible that Plaintiff-Trustee could not present the court with documentation, evidence, or testimony of any actual, *bona fide* joint venture.  Given Plaintiff-Trustee's level of sophistication, if he intended to create a joint venture, it would have been sufficiently documented and not merely two words thrown into the

Foreclosure Cancellation Guaranty to justify additional compensation equal to 339% interest per annum on the monies loaned.  (Interest computation addressed in the court's Decision below.)

The court also does not find credible Plaintiff-Trustee's assertion and his counsel's closing argument that the Plaintiff-Trustee was at great risk and would only be repaid if the deal worked. Such is contrary to the clear evidence presented to the court.  Plaintiff-Trustee had the Deed of Trust securing his position.  Plaintiff-Trustee's Deed of Trust on Defendant-Debtor's Residence was second in priority to the deed of trust securing the loan that was in default and for which Plaintiff-Trustee would advance (loan) the monies to cure the default.

Though Plaintiff-Trustee's Deed of Trust was in a junior priority position to the Freedom Mortgage deed of trust, Plaintiff-Trustee clearly had access to funds to protect his position under his Deed of Trust.  As shown to the court at trial, there was $180,000.00+ of equity in the Residence in excess of the obligation secured by the Freedom Mortgage senior deed of trust and repayment of the monies advanced (loaned) by Plaintiff-Trustee.  Given Plaintiff-Trustee's great financial sophistication, the court can find no credible evidence that Plaintiff-Trustee was lending the original $37,000.00 on a last minute speculative venture in which he stood a high probability of losing everything.  The Plaintiff-Trustee was not under great stress or financial risk, having clearly protected himself with the Deed of Trust and ability to foreclose on the Residence as provided in the Foreclosure Cancellation Guaranty.

Further, if Freedom Mortgage did not accept the $37,000.00 cure payment advanced (loaned) by Plaintiff-Trustee, then it would have been paid back to Plaintiff-Trustee by Freedom Mortgage. The risk to Plaintiff-Trustee was minimal, if any.

The court further concludes from Plaintiff-Trustee's testimony that Plaintiff-Trustee found the less sophisticated consumer Defendant-Debtor ripe for the picking and jumped on the opportunity to take from Defendant-Debtor 50% of the substantial equity for making only a $37,000.00 advance (loan), which advance (loan) was secured by substantial equity in the Residence and would be repaid.  Further, that Plaintiff-Trustee knowingly has chosen to turn a blind eye to the California consumer protection laws governing his business of being a Foreclosure Consultant making loans to consumers whose homes are in foreclosure to cure the defaults and reinstate such

9

loans.  This may be a situation where Plaintiff-Trustee "knows" he is smarter than his attorneys who drafted the Foreclosure Cancellation Guaranty and can act based on what he states the law to be so he can make big profits, and ignore what California Law and the plain language of the Foreclosure Cancellation Guaranty (drafted by Plaintiff-Trustee and his attorney) actually state.

The court finds Plaintiff-Trustee's testimony that the services he provided were not those of a Foreclosure Consultant, that he and First Trust were merely real estate investors, and that Plaintiff-Trustee did not provide any consulting or other services to Defendant-Debtor to stop the foreclosure on his residence by Freedom Mortgage: (1) to cure the default upon which the foreclosure was based, (2) have the foreclosing lender waive the acceleration of the obligation that was the subject of the foreclosure, or (3) to save Defendant-Debtor's residence from foreclosure to each not be credible, contrary to the evidence presented, and without merit.

Defendant-Debtor

For Defendant-Debtor, he appears to be the average consumer, less sophisticated, and given to deferring making hard decisions and owning up to one's financial straits.  While not necessarily gullible, he is the type of consumer who will take the easier answer at the eleventh hour rather than planning ahead and address the actual, reasonable financial situation and put a viable game plan in action.  The fact that this less sophisticated consumer stumbled and fumbled until the eleventh hour does not grant license for Plaintiff-Trustee to violate California law and take away 50% of Defendant-Debtor's equity in his residence.

As the court notes above, while less sophisticated, the Defendant-Debtor signed the Deed of Trust to secure the enforceable financial obligation under the Foreclosure Cancellation Guaranty - even though it was not presented by Plaintiff-Trustee until two months after the Contract was executed and the loan made.  This demonstrates a level of good faith on behalf of Defendant-Debtor.

However, Defendant-Debtor's testimony raised some questions of credibility.  He testifies that multiple bankruptcy cases were choreographed by Plaintiff-Trustee and monies were paid, but did not provide any documentation of the payments.  Also, in looking at his own signature on the bankruptcy documents, Defendant-Debtor waffled, saying a signature was his, and then saying it was not.

At the end of the day, the less sophisticated consumer Defendant-Debtor is the party who California Law has chosen to provide statutory protections for when such consumer is dealing with someone who is purporting to help save their residence from foreclosure – such as Plaintiff-Trustee in this Adversary Proceeding.

**EVE OF FORECLOSURE SALE PANIC,**
**MONIES ADVANCED BY PLAINTIFF-TRUSTEE,**
**FORECLOSURE RESCINDED, DEFAULT CURED**
**AND FREEDOM MORTGAGE LOAN REINSTATED**

Though Plaintiff-Trustee's and Defendant-Debtor's testimonies as to what occurred in the Fall of 2019 differ greatly, they do substantially agree on what occurred after February 1, 2020 (though they disagree on the legal conclusions as to what they did and the legal consequences thereof).

On February 10, 2020, Defendant-Debtor contacted Plaintiff-Trustee, seeking assistance as the nonjudicial foreclosure sale set for the Freedom Mortgage Loan was scheduled to be conducted at 10:00 a.m. on February 11, 2020. As Plaintiff-Trustee recounts those events, he met with Defendant-Debtor on the evening of February 10, 2020. Defendant-Debtor's testimony corroborates that this meeting took place around 8:00 p.m. on February 10, 2020, a mere fourteen hours before the scheduled nonjudicial foreclosure sale.

Plaintiff-Trustee prepared the Foreclosure Cancellation Guaranty which provided for Plaintiff-Trustee advancing $37,000.00 to cure the default that led to the scheduled nonjudicial foreclosure sale. The Foreclosure Cancellation Guaranty (Exhibit 2) was signed on February 10, 2020, and on the morning of February 11, 2020, Plaintiff-Trustee advanced and wired $37,000.00 to Freedom Mortgage to cure the default and for whom the nonjudicial foreclosure sale was set to be conducted on February 11, 2020.

Exhibit 3 of Plaintiff-Trustee is the Wire Application and Agreement he signed for Banner Bank to wire the $37,000.00 to Freedom Mortgage Corporation. The Date/Time Entered on Wire Application and Agreement is "2/11/2020 9:18 a.m."[3]

---

[3] In looking at the Wire Application and Agreement, the name of the Account Holder is identified as "Carl L. Dexter." It is not First Trust or Carl L. Dexter, Trustee of First Trust. From the evidence provided it is not clear whether First Trust made the advance pursuant to Foreclosure

With the cure payment money being wired by Plaintiff-Trustee less than an hour before the scheduled nonjudicial foreclosure sale, the trustee under the deed of trust conducted the sale on February 10, 2020.  After about a month of communications, Freedom Mortgage agreed to rescind the sale, have the default cured, the Freedom Mortgage Loan reinstated, and Defendant-Debtor move forward with a clean loan slate.

At this juncture one would think that Plaintiff-Trustee and Defendant-Debtor having achieved the Foreclosure Cancellation Guarantee Contract goals of Plaintiff-Trustee advancing (lending) the $37,000.00 to cure the default, actually curing the default, stopping the foreclosure sale, reinstating the obligation secured by Defendant-Debtor's Residence, and saving Defendant-Debtor's Residence from foreclosure, the Parties could celebrate.  Alas, that was not the case, in large part because of the terms of the Foreclosure Cancellation Agreement (drafted by Plaintiff-Trustee and his attorney) which was signed during the exigencies of the evening of February 10, 2020, a mere fourteen hours before the scheduled foreclosure sale.

By the terms of the Foreclosure Cancellation Guaranty, Plaintiff-Trustee sought the liquidation of Defendant-Debtor's Residence from which the $37,000.00 advance (loan) made by Plaintiff-Trustee to cure the default, stop the foreclosure sale, and reinstate the Freedom Mortgage Loan, and Plaintiff-Trustee would additionally get 50% of the Net Sales Proceeds of the Residence (which 50% of the equity constitutes an amount equal to a 339% per annum interest for the $37,000.00 loaned by Plaintiff-Trustee to cure the default and stop the foreclosure sale).

The court now reviews the Foreclosure Cancellation  Guaranty, which was drafted by Plaintiff-Trustee and his counsel, and the various terms and rights argued by the Parties.

**Review of Foreclosure Cancellation Guaranty**
**and Related Documents**

A copy of the Foreclosure Cancellation Guaranty is provided as Plaintiff-Trustee's Exhibit 2.  From the title, one would initially believe that Plaintiff-Trustee was guarantying that he and First Trust would prevent any foreclosure sale from occurring.  Such an interpretation would be far from

---

Cancellation Guaranty or whether Carl L. Dexter, personally, made the advance.

how Plaintiff-Trustee describes the Contract as a mere real estate investment, which Plaintiff-Trustee and his attorney prepared, and was presented to Defendant-Debtor to be signed on the evening of February 10, 2020, hours before the scheduled nonjudicial foreclosure sale.

On page 1 of the Foreclosure Cancellation Guaranty, "First Trust, Carl Dexter, Trustee" is identified as the "Guarantor" and Defendant-Debtor is identified as the "Home Owner." For consistency in identification in discussing the Foreclosure Cancellation Guaranty and its terms, the court continues referencing the parties as Plaintiff-Trustee and Defendant-Debtor, who are respectively identified as "Guarantor" and "Home Owner" in the Foreclosure Cancellation Guaranty.

After identify the parties, the Foreclosure Cancellation Guaranty states that it is being entered into:

> [f]or the express purpose of **curing the default of a note secured by deed of trust on the residence** of [Defendant-Debtor].

Foreclosure Cancellation Guaranty, first full paragraph commencing with **THIS Guaranty is made between** . . . .; Exhibit 2 (emphasis in original).

Starting with this plain language, the purpose of the Foreclosure Cancellation Guaranty is expressly stated to be for the purpose of curing the default on the Freedom Mortgage Loan secured by a deed of trust encumbering the consumer Defendant-Debtor's residence. Though Plaintiff-Trustee now testifies that he was not providing services to assist Defendant-Debtor in curing the default on the Freedom Mortgage Loan secured by Defendant-Debtor's Residence and stopping the nonjudicial foreclosure sale, the Contract prepared by Plaintiff-Trustee and his attorney expressly states to the contrary that the Plaintiff-Trustee's obligations are to advance (loan) the monies to cure the default and reinstate the Freedom Mortgage Loan that is secured by Defendant-Debtor's Residence.

The Foreclosure Cancellation Guaranty then continues at the middle of page 1 and running through the top half of page 2, has the following "Whereas" statements (court bolded **emphasis added**):

> "WHEREAS, the real property [the Residence] is the **single family residence**

**occupied by** the [**Defendant-Debtor**]; and

WHEREAS, the **real property [Residence] is now in foreclosure** . . .' and

WHEREAS ON THE TERMS AND CONDITIONS SET FORTH IN THIS Guaranty [**Plaintiff-Trustee] is willing to cure the below-described defaults** and **reinstate the loans**;[4]

> First Deed of Trust with FREEDOM MORTGAGE #XXXXXXXXXX in the amount of $37,000.00 [Plaintiff-Trustee] will pay directly to FREEDOM MORTGAGE

WHEREAS, **the [Plaintiff-Trustee] is a** real estate investor (**foreclosure consultant**); and

WHEREAS [Plaintiff-Trustee] does not have any representative working for them and is meeting directly with [Defendant-Debtor] and is directly negotiating the terms and conditions for the implementation of this Guaranty.

Beginning in the middle of page 2 and continuing to the middle of page 7, the agreed terms of Plaintiff-Trustee and Defendant-Debtor are stated. As the court noted at trial, and which seemed to surprise Plaintiff-Trustee, the very first term agreed to is as follows (court bolded **emphasis added**):

> 1.     **Each** of the prefatory **paragraphs commencing with the word *WHEREAS*,** contains a **true and correct statement of fact**, and the **parties** hereafter **shall be estopped to deny the truth thereof.**

Thus, on its face, the Plaintiff-Trustee and the Defendant-Debtor have agreed that all of the *WHEREAS* statements are true and cannot be contradicted by either of them.[5] This includes the statement above that Plaintiff-Trustee is a "Foreclosure Consultant," which term modifies the reference to Plaintiff-Trustee being a "real estate investor."

So, in reading the WHEREAS paragraphs, the facts which Plaintiff-Trustee and Defendant-Debtor state are true and unassailable include:

///

---

[4] Mortgage number redacted by the court.

[5] The term "prefatory" does not limit the agreed truthfulness of the statements, but is merely referencing that they are part of the introductory statements of the Guaranty. Merriam-Webster Dictionary.

1.    The Residence is the Defendant-Debtor's residence.

2.    The Defendant-Debtor's residence is in foreclosure.

3.    Plaintiff-Trustee is willing to cure the described defaults and reinstate the loan with Freedom Mortgage that is secured by the Defendant-Debtor's residence.

4.    **Plaintiff-Trustee** is not merely a "real estate investor" but **expressly identifies himself** in the Foreclosure Cancellation Guarantee drafted by Plaintiff-Trustee and his attorney **as a "foreclosure consultant**."

At the trial, Plaintiff-Trustee attempted to disavow this statement (which the Foreclosure Cancellation Guaranty expressly states he is estopped from denying), saying he was "merely" a real estate investor and that the language stating that he is a "foreclosure consultant" dates back to earlier law in California governing foreclosure consultants, and that the statement which the first agreement term in the Foreclosure Cancellation Guaranty cannot be denied should just be ignored.

As will develop below, this reference to a "foreclosure consultant" is not a merely typo from law long ago amended, but is consistent with other provisions of the Foreclosure Cancellation Guaranty and the California Law expressly included in the Foreclosure Cancellation Guaranty which was drafted by Plaintiff-Trustee and his attorney.

**Financial Terms of the**
**Foreclosure Cancellation Guaranty**
**and Security for Monies Advanced (Loaned)**

The Foreclosure Cancellation Guaranty provides that if it is not cancelled by the Defendant-Debtor before 11:59 p.m. 10 February 2020, or as soon thereafter as is possible, then:

a.    Plaintiff-Trustee "**shall cure the defaults**" on the obligation owed to Freedom Mortgage secured by the Deed of Trust against Defendant-Debtor's residence.

b.    The **initial "sum** (estimated) to be so **provided by" Plaintiff-Trustee is $37,000.**

c.    "The **cure money** shall be paid by/on behalf of [Plaintiff-Trustee] directly to the foreclosing creditor and not to [Defendant-Debtor]."

///

_____

Exhibit 2; Foreclosure Cancellation Guaranty, ¶ 2, p. 2. (Emphasis added.)

Deed of Trust

The terms continue, in paragraph 3 (*Id.*), stating that the Foreclosure Cancellation Guaranty shall be secured by a Deed of Trust on the Residence, and a copy is attached to the Foreclosure Cancellation Guaranty. No copy of a deed of trust is attached to the Foreclosure Cancellation

15

Guaranty. The Plaintiff-Trustee testified that due to the rush in putting together the Foreclosure Cancellation Guaranty and getting the $37,000.00 wired so the foreclosure would be cancelled, the Deed of Trust to secure the advance (loan) was prepared later. The Deed of Trust was drafted a month later after the parties confirmed that the foreclosing creditor accepted the $37,000.00 transmitted by Plaintiff-Trustee as the cure payment and Defendant-Debtor's Obligation was no longer in default.

The Foreclosure Cancellation Guaranty continues (*Id.*, p. 3) stating in paragraph 5 that in consideration for the cure of the default (the $37,000.00 monies advanced to pay to stop the foreclosure sale), the Defendant-Debtor shall do the following (paraphrased by the court and identified by the paragraph number used in the Foreclosure Cancellation Guaranty, with emphasis as in the original):

(5)(a)  Execute the Deed of Trust.

(5)(b)  "Comply with [Plaintiff-Trustee] to complete renovation and place said property on the market for sale within 60 days from February 11, 2020."

(5)(c)  "Said property is to be listed for sale with a <u>TO BE DETERMINED BY [PLAINTIFF-TRUSTEE]</u> a licensed California real estate broker."

(5)(d)  "Said escrow to be placed with TO BE DETERMINED BY [PLAINTIFF-TRUSTEE].

(5)(e)  This paragraph specifies how the sales proceeds will be disbursed. The court has broken up the one long block paragraph into the parts below to make the review thereof easier and more readable.

Paragraph 5(e) contractually sets the interest rate for monies advanced (loaned) by Plaintiff-Trustee, which were to be repaid when Defendant-Debtor's Residence was sold, stating:

> From the sales proceeds at close of escrow, pay to [Plaintiff-Trustee] the amount actually paid out by the Guarantor pursuant to this Guaranty, interest on the amount actually paid out at the rate of **ZERO** percent (0.00) per annum from date said monies are paid out by [Plaintiff-Trustee] are actually returned to the [Plaintiff-Trustee]; . . . .

*Id.*, ¶ 5(e) (emphasis in original).

Then, Paragraph 5(e) further provides that in addition to being repaid for the monies advanced (loaned) to cure the default, stop the foreclosure sale, and reinstate the Freedom Mortgage Loan, Plaintiff-Trustee is to be paid 50% of the net sales proceeds from the immediate sale of

1    Defendant-Debtor's Residence, stating:

2         [f]or this Guaranty, the Home Owner [Defendant-Debtor] and Guarantor
         [Plaintiff-Trustee] enters into a **JOINT VENTURE WITH A <u>50/50 SPLIT</u>
3         <u>OF NET PROCEEDS.</u>**

4    *Id.* [triple emphasis in original].  The Foreclosure Cancellation Guaranty, Paragraph 5(e), then

5    provides a mechanism for Plaintiff-Trustee to make his demand for payment directly from escrow

6    without instructions from Defendant-Debtor, stating:

7         The Guarantor [Plaintiff-Trustee] may present a copy of this Guaranty to the
         escrow established to handle sale of the real property [the Residence] . . . [it]
8         shall serve as non-cancelable escrow instructions of the Home Owner
         [Defendant-Debtor] to pay such sum to Guarantor [Plaintiff-Trustee] before
9         any portion of the escrow is paid out to Home Owner [Defendant-Debtor].

10   *Id.*

11        Paragraph 6 of the Foreclosure Cancellation Guaranty provides that if the Defendant-Debtor

12   fails to comply with the obligation to market the Residence for sale within sixty (60) days, then

13   Plaintiff-Trustee can foreclose on his Deed of Trust.

14        Paragraph 9 of the Foreclosure Cancellation Guaranty includes a contractual attorney's fee

15   provision for the prevailing party for any litigation concerning the Foreclosure Cancellation

16   Guaranty.

17        Paragraph 10 expressly provides that the Foreclosure Cancellation Guaranty, which was

18   drafted by Plaintiff-Trustee and his attorney, is governed by the laws of the State of California.

19        As discussed below, the plain language of the Foreclosure Cancellation Guaranty states that

20   Plaintiff-Trustee's obligations are the curing of the default and reinstatement of the Freedom

21   Mortgage Loan that was in default.  *See*, Fourth WHEREAS Paragraph, p. 2 of Foreclosure

22   Cancellation Guaranty.  For curing the default and reinstating the loan secured by the Residence,

23   Defendant-Debtor's obligation is stated to be to repay Plaintiff-Trustee the monies advanced (the

24   $39,705.53) and disburse half the equity in the property (50% of $180,000+) from the required

25   immediate sale thereof.  Foreclosure Cancellation Guaranty ¶ 5(e).   The Foreclosure Cancellation

26   Guaranty itself states in its plain language that Plaintiff-Trustee will be paid half the equity in the

27   Property (in addition to repaying the monies advanced by Plaintiff-Trustee) for making the

28   Foreclosure Cancellation Guaranty advance (loan) to cure the default and stop the foreclosure sale

17

of Defendant-Debtor's Residence.

**REVIEW OF CALIFORNIA CONSTRUCTION OF CONTRACTS LAW**
**AND**
**CONSUMER PROTECTION LAW RE FORECLOSURE CONSULTANTS**

This Adversary Proceeding, as many do, presents the federal Bankruptcy Court with nonbankruptcy, State Law legal issues to address. This is a common occurrence not only for bankruptcy judges, but also bankruptcy attorneys.

**Interpretation of the Contract**

Here, the court is presented with a contract, the Foreclosure Cancellation Guaranty, which was drafted by Plaintiff-Trustee and his attorney. This was presented to the Defendant-Debtor on the evening of February 10, 2020, less than fourteen hours before the pending foreclosure sale the next morning.[6]

When the court is presented with a contract that a party seeks to enforce, the rules governing the interpretation of that contract are well established. One begins with California Civil Code, which provisions governing the interpretations of contracts include:

Cal. Civ. § 1638. Ascertainment of intention; language

> The language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity.

Cal. Civ. § 1639. Ascertainment of intention; written contracts

> When a contract is reduced to writing, the intention of the parties is to be ascertained from the writing alone, if possible; subject, however, to the other provisions of this Title.

§ 1641. Whole contract, effect to be given

> The whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other.

///

///

///

---

[6] The court acknowledges that this last minute presentation of the contract was significantly caused by the conduct of the Defendant-Debtor by waiting until the evening of February 10, 2020, to call Plaintiff-Trustee and ask him to come and "save the day" based on some of the earlier representations of Plaintiff-Trustee of what he could do to stop the foreclosure sale.

18

§ 1644. Sense of words

> The words of a contract are to be understood in their ordinary and popular sense, rather than according to their strict legal meaning; unless used by the parties in a technical sense, or unless a special meaning is given to them by usage, in which case the latter must be followed.

§ 1645. Sense of words; technical words

> Technical words are to be interpreted as usually understood by persons in the profession or business to which they relate, unless clearly used in a different sense.

§ 1654. Language interpreted against party who caused uncertainty

> In cases of uncertainty not removed by the preceding rules, the language of a contract should be interpreted most strongly against the party who caused the uncertainty to exist.

As discussed by the California Supreme Court:

> Finally, ambiguities in standard form contracts are to be construed against the drafter. (*Baker v. Sadick* (1984) 162 Cal.App.3d 618, 625, 208 Cal.Rptr. 676; *Player v. Geo. M. Brewster & Son, Inc.* (1971) 18 Cal.App.3d 526, 533, 96 Cal.Rptr. 149; Civ.Code, § 1654.) This court must apply these basic principles to determine whether the petitioner's causes of action fall within the scope of the arbitration clause.

*Victoria v. Superior Court*, 40 Cal. 3d 734,739 (1985).

**Foreclosure Consultant**
**Consumer Protection Law**

In 1979, the California Legislature created statutory protections for consumers who were facing the loss of their homes due to foreclosures. These laws place limitations on third-parties who came forward to "assist" the consumer in preventing the foreclosure from occurring or recovering any proceeds remaining after a foreclosure sale which was in excess of the secured obligation. These are found in Title 14, Article 1.5 of the California Civil Code, §§ 2945 - 2945.11.

The California Legislature provides statutory "Legislative findings and declarations; Intent and purposes of article [1.5]; Liberal construction" of these provisions, stating in California Civil Code § 2945 [**emphasis** added]:

> § 2945. Legislative findings and declarations; Intent and purposes of article; Liberal construction
>
> (a) The Legislature finds and declares that **homeowners whose residences are in foreclosure are subject to** fraud, deception, harassment, and **unfair dealing by**

19

**foreclosure consultants from the time a Notice of Default is recorded** pursuant to Section 2924 until the time surplus funds from any foreclosure sale are distributed to the homeowner or his or her successor. **Foreclosure consultants represent that they can assist homeowners who have defaulted on obligations secured by their residences.** These **foreclosure consultants, however, often charge high fees**, the payment of which is **often secured by a deed of trust on the residence to be saved**, and perform no service or essentially a worthless service. Homeowners, relying on the foreclosure consultants' promises of help, take no other action, are diverted from lawful businesses which could render beneficial services, and often lose their homes, sometimes to the foreclosure consultants who purchase homes at a fraction of their value before the sale. Vulnerable homeowners are increasingly relying on the services of foreclosure consultants who advise the homeowner that the foreclosure consultant can obtain the remaining funds from the foreclosure sale if the homeowner executes an assignment of the surplus, a deed, or a power of attorney in favor of the foreclosure consultant. This results in the homeowner paying an exorbitant fee for a service when the homeowner could have obtained the remaining funds from the trustee's sale from the trustee directly for minimal cost if the homeowner had consulted legal counsel or had sufficient time to receive notices from the trustee pursuant to Section 2924j regarding how and where to make a claim for excess proceeds.

(b) The Legislature further finds and declares that **foreclosure consultants have a significant impact on the economy of this state and on the welfare of its citizens.**

(c) The **intent and purposes** of this article are the following:

(1) To require that foreclosure consultant service agreements be expressed in writing; to **safeguard the public against** deceit and **financial hardship**; to permit rescission of foreclosure consultation contracts; to prohibit representations that tend to mislead; and to **encourage fair dealing in the rendition of foreclosure services.**

(2) The **provisions of this article shall be liberally construed to effectuate this intent and to achieve these purposes.**

This section was amended in 2004 to add the provisions relating to recovering surplus monies after a foreclosure sale had occurred.  2004 Cal SB 1277

California law then lays out specific provisions identifying the protections provided, the services covered, and the requirements placed on a "Foreclosure Consultant."

<u>Statutory Definitions</u>

California Civil Code § 2945.1 provides statutory definitions for application of Civil Code Title 14, Article 1.5 relating to Foreclosure Consultants and the services they provide.  Civil Code § 2945.1(a) provides the statutory definition of a "Foreclosure consultant" [**emphasis** <u>added</u>]:

(a) "**Foreclosure consultant**" means <u>any person </u>who makes **any solicitation, representation, or offer** to any owner **to perform for compensation** or **who, for compensation, performs any service** which the person in any manner represents

will in any manner do **any of the following**:

    **(1) Stop or postpone the foreclosure sale**.

    (2) <u>Obtain any forbearance from any beneficiary or mortgagee</u>.

    **(3) Assist the owner to exercise the right of reinstatement provided in Section 2924c.**

    (4) Obtain any extension of the period within which the owner may reinstate his or her obligation.

    **(5) Obtain any waiver of an acceleration clause contained in any promissory note or contract secured by a deed of trust or mortgage on a residence in foreclosure or contained that deed of trust or mortgage.**

    **(6) Assist the owner to obtain a loan or advance of funds**.

    (7) Avoid or ameliorate the impairment of the owner's credit resulting from the recording of a notice of default or the conduct of a foreclosure sale.

    **(8) Save the owner's residence from foreclosure.**

    (9) Assist the owner in obtaining from the beneficiary, mortgagee, trustee under a power of sale, or counsel for the beneficiary, mortgagee, or trustee, the remaining proceeds from the foreclosure sale of the owner's residence.

As the undisputed evidence shows, Plaintiff-Trustee's Contract was to provide services to (identified by the paragraph numbers in the forgoing statute): (1) Stop the foreclosure sale from occurring, (5) Reinstate the loan and have the acceleration of the defaulted debt reversed and Defendant-Debtor's loan not to be in default, (6) Assist Defendant-Debtor in obtaining the advance of funds to cure the default [with those monies advanced by Plaintiff-Trustee himself], and (8) Save Defendant-Debtor's Residence from foreclosure, which was scheduled to be conducted less than fourteen hours after Defendant-Debtor signed Plaintiff-Trustee's contract for such services.

California Civil Code § 2945.1(b) provides a list of statutory exclusions from the definition of a "Foreclosure Consultant." Plaintiff-Trustee did not assert that he qualified for any of the statutory exclusions and the evidence did not show that Plaintiff-Trustee qualified for any of the statutory exclusions.

California Civil Code § 2945.1(e) provides a nonexclusive definition of the term "Service" provided by a Foreclosure Consultant [emphasis added]:

///

(e) "**Service" means and includes**, but is not limited to, any of the following:

    (1) Debt, budget, or financial counseling of any type.

    (2) Receiving money for the purpose of distributing it to creditors in payment or partial payment of any obligation secured by a lien on a residence in foreclosure.

    **(3) Contacting creditors on behalf of an owner of a residence in foreclosure.**

    (**4) Arranging or attempting to arrange for an extension of the period within which the owner of a residence in foreclosure may cure his or her default and reinstate his or her obligation pursuant to Section 2924c.**

    **(5) Arranging or attempting to arrange for any delay or postponement of the time of sale of the residence in foreclosure.**

    (6) Advising the filing of any document or assisting in any manner in the preparation of any document for filing with any bankruptcy court.

    **(7) Giving any advice, explanation, or instruction to an owner of a residence in foreclosure which in any manner relates to the cure of a default in or the reinstatement of an obligation secured by a lien on the residence in foreclosure**, the full satisfaction of that obligation, or the postponement or avoidance of a sale of a residence in foreclosure pursuant to a power of sale contained in any deed of trust.

    (8) Arranging or attempting to arrange for the payment by the beneficiary, mortgagee, trustee under a power of sale, or counsel for the beneficiary, mortgagee, or trustee, of the remaining proceeds to which the owner is entitled from a foreclosure sale of the owner's residence in foreclosure. Arranging or attempting to arrange for the payment shall include any arrangement where the owner transfers or assigns the right to the remaining proceeds of a foreclosure sale to the foreclosure consultant or any person designated by the foreclosure consultant, whether that transfer is effected by agreement, assignment, deed, power of attorney, or assignment of claim.

    (9) Arranging or attempting to arrange an audit of any obligation secured by a lien on a residence in foreclosure.

    Continuing, California Civil Code § 2945.1(h) defines the term "Contract" with a Foreclosure Consultant to be, "any agreement, or any term thereof, between a foreclosure consultant and an owner [consumer whose residence is in foreclosure] for the rendition of any service" of a Foreclosure Consultant.

<u>Right to Cancellation</u>

    California Civil Code § 2045.2 provides that the home owner has a right to cancel the contract with a Foreclosure Consultant, which may be exercised by midnight of the fifth business

22

day after such contract is signed.  In 2008, this provision was amended to increase the period in which the home owner had the right to cancel the contract with the Foreclosure Consultant from three (3) business days after signing the contract to five (5) business days after signing the contract with the Foreclosure Consultant.

Form and Content of Contract
With a Foreclosure Consultant

California Civil Code § 2945.3 provides that the contract with the Foreclosure Consultant must be in writing, fully disclose the services to be provided and compensation paid to the Foreclosure Consultant, and provide and include (identified by paragraph number in Cal. Civ. 2945.3):

(b) An at least 14-point boldface type notice that the Foreclosure Consultant cannot be paid until completely finishing the everything provided in the contract.

(d) contact the statement, "You, the owner, may cancel this transaction at any time prior to midnight of the fifth business day after the date of this transaction. See the attached notice of cancellation form for an explanation of this right."

(e) Contain on the first page the following information:

(1) The name, mailing address, electronic mail address, and facsimile number of the foreclosure consultant to which the notice of cancellation is to be mailed.

(2) The date the owner signed the contract.

(f) The contract with the Foreclosure Consultant be accompanied by a completed form, in duplicate, providing the statutory specified "Notice of Cancellation" form.

Violations of Title 14, Article 1.5

California Civil Code § 2045.4 provides when a Foreclosure Consultant is in violation of California law, with those statutory violations including (emphasis added):

§ 2945.4. Violations

It shall be a violation for a foreclosure consultant to:
. . .
(b) Claim, demand, charge, collect, or **receive any fee, interest, or** <u>any other compensation for any reason</u> which **exceeds 10 percent per annum of the amount of <u>any loan which the foreclosure consultant may make to the owner</u>**.

(c) **Take any** wage assignment, **any lien of any type on real** or personal **property**, or other security **to secure the payment of compensation**. <u>That security shall be void and unenforceable.</u>

. . .

(e) **Acquire any interest in a residence in foreclosure from an owner with whom the foreclosure consultant has contracted.** Any interest acquired in violation of this subdivision shall be voidable, provided that nothing herein shall affect or defeat the title of a *bona fide* purchaser or encumbrancer for value and without notice of a violation of this article. Knowledge that the property was "residential real property in foreclosure," does not constitute notice of a violation of this article. This subdivision may not be deemed to abrogate any duty of inquiry which exists as to rights or interests of persons in possession of residential real property in foreclosure.

## DECISION

While the legal conclusions drawn by the respective Parties from the facts presented to the court relating to the Foreclosure Cancellation Guaranty, the "Contract" between Plaintiff-Trustee and Defendant-Debtor, are in dispute, the basic facts are not. The court begins with the written Foreclosure Cancellation Guaranty (Exhibit 2) prepared by Plaintiff-Trustee and his attorney (that attorney did not appear at trial to testify) that was given to Defendant-Debtor to sign less than fourteen (14) hours before the scheduled nonjudicial foreclosure sale on Defendant-Debtor's residence (Defendant-Debtor waiting until 8:00 p.m. on February 10, 2022 to contact Plaintiff-Trustee to save the residence from foreclosure) due to defaults on the Freedom Mortgage Loan.

As reviewed above, the Foreclosure Cancellation Guaranty expressly provides that the following facts stated in the unnumbered Whereas Paragraphs on pages 1 and 2 of the Foreclosure Cancellation Guaranty cannot be disputed or denied by Plaintiff-Trustee or Defendant-Debtor include, but are not limited to:

a.　　Defendant-Debtor's residence was in foreclosure.

b.　　Plaintiff-Trustee shall advance the monies to cure the defaults on the Freedom Mortgage Loan for which the nonjudicial foreclosure sale is occurring.

c.　　The Plaintiff-Trustee identifies himself and First Trust (in the Contract prepared by Plaintiff-Trustee and his attorney) as a "real estate investor" and a "foreclosure consultant."

d.　　In the Fourth WHEREAS Paragraph ( p. 2 of the Foreclosure Cancellation Guaranty), Plaintiff-Trustee states the obligations of Plaintiff-Trustee to be that "Plaintiff-Trustee is willing to cure the below-described defaults and reinstate the loans: [description of Freedom Mortgage Loan in default secured by Debtor's Residence set for foreclosure sale of February 11, 2020];. . . ."

These are the obligations of Plaintiff-Trustee and services to be provided by Plaintiff-Trustee. These are then repeated in Paragraph 2 of the Foreclosure Cancellation Guaranty stating Plaintiff-Trustee's obligation is: that "from funds provided solely by/through [Plaintiff-Trustee], [Plaintiff-Trustee] shall cure the default(s) identified above [the Freedom Mortgage Loan for which the February 11, 2020 foreclosure sale was set]."

The express terms of the Foreclosure Cancellation Guaranty, as drafted by Plaintiff-Trustee and his attorney, state that the only services provided by Plaintiff-Trustee are to loan the money to cure the default and reinstate the Freedom Mortgage Loan secured by Defendant-Debtor's Residence. Thus, the sum total of what the Foreclosure Cancellation Guaranty states are Plaintiff-Trustee's contractual obligations are to advance (loan) the money to cure the default on the Freedom Mortgage Loan and then reinstate such obligation secured by Defendant-Debtor's Residence.

Then, on pages 2 and 3 of the Foreclosure Cancellation Guaranty, Plaintiff-Trustee and Defendant-Debtor agree that for the services provided by Plaintiff-Trustee to cure the default and have the loan secured by Debtor's Residence reinstated (identified by paragraph number in the Contract):

3. The Foreclosure Cancellation Guaranty obligations of Defendant-Debtor are secured by a Deed of Trust given to Plaintiff-Trustee to be recorded against the Defendant-Debtor's residence that is the subject of the Freedom Mortgage foreclosure sale for which Plaintiff-Trustee will cure the default and reinstate the Freedom Mortgage Loan.

5.b. In consideration for the monies advance and Plaintiff-Trustee curing the default and reinstating the Freedom Mortgage Loan secured by Defendant-Debtor's residence, Defendant-Debtor agrees to place the residence on the market for sale within sixty (60) days after February 11, 2020 (the foreclosure date for which Plaintiff-Trustee will cure the default and have Defendant-Debtor's loan reinstated as being current).

5.e In consideration of the monies advanced, Plaintiff-Trustee will be repaid the monies advanced (here the evidence shows it was $39,705.53), with no interest, and also 50% of the sales proceeds with the Contract also providing for there being a joint venture to split the sales proceeds.

6. If Defendant-Debtor refuses to timely proceed with the sale of the residence, Plaintiff-Trustee may foreclose on his deed of trust which secures the obligation to pay the monies advance and 50% of the sale proceeds which are consideration for having advanced the monies to cure the default and stop the foreclosure sale.

Plaintiff-Trustee did just what the Foreclosure Cancellation Guaranty required, he advanced $37,000.00 to cure the default, stopped the foreclosure sale, and reinstated the Freedom Mortgage

Loan. Plaintiff-Trustee advanced an additional $2,705.53 for some work on the Residence in preparation of the prompt sale of the Residence (Exhibit A; Direct Testimony Statement ¶ 68) so that Plaintiff-Trustee could get paid back the $37,000.00 advanced (loaned), the $2,705.53 for repairs, and 50% of the Net Proceeds from the sale of Defendant-Debtor's Residence.

The services to be provided by Plaintiff-Trustee hit the mark of Plaintiff-Trustee and First Trust being a Foreclosure Consultant subject to California Civil Code §§ 2945 et. seq. in several different ways. These include:

- ♦ Expressly identifying Plaintiff-Trustee and First Trust as a "foreclosure consultant" in a statement that the Contract expressly states that Plaintiff-Trustee cannot dispute.

- ♦ Contacting Freedom Mortgage, the foreclosing mortgage creditor, on behalf of Defendant-Debtor as the owner of the Residence in foreclosure.

- ♦ Plaintiff-Trustee services were to stop or postpone the Freedom Mortgage foreclosure sale - which Plaintiff-Trustee succeeded in stopping, having the default cured, and the Freedom Mortgage Loan reinstated.

- ♦ Plaintiff-Trustee obtained forbearance from Freedom Mortgage (the foreclosing lender) in enforcing the trustee's sale conducted on February 11, 2020, and then convinced Freedom Mortgage to cancel the nonjudicial foreclosure sale which occurred and foreclosure trustee's deed issued pursuant thereto.

- ♦ Though the time for enforcing reinstatement rights under California Civil Code § 2924c had expired (Plaintiff-Trustee making the cure payment the day of the scheduled foreclosure sale), Plaintiff-Trustee's services under the Foreclosure Cancellation Guaranty included Plaintiff-Trustee convincing Freedom Mortgage to reinstate its loan.

- ♦ Even though the California Civil Code § 2924c cure and reinstatement of the loan as a matter of right had expired, Plaintiff-Trustee was able to successfully convince Freedom Mortgage to extend the time to allow the cure to be made and reinstate the Freedom Mortgage Loan.

- ♦ Though the acceleration clause could be enforced and the "mere" $37,000 cure amount rejected, Plaintiff-Trustee's services were to obtain a waiver of that acceleration and have Freedom Mortgage, as the foreclosing lender, accept the "mere" cure amount, waive the acceleration and right to demand payment of the full amount of the secured debt, and reinstate the Freedom Mortgage Loan.

- ♦ Plaintiff-Trustee assisted Defendant-Debtor to obtain a loan or advance of the monies necessary to cure the default and stop the Freedom Mortgage foreclosure sale, with Plaintiff-Trustee making the advance to cure the default and reinstatement of the Freedom Mortgage Loan (for which sought to recover not only repayment of the advance, but also 50% of the sales proceeds based on the consideration for having advanced the monies).

- ♦ Plaintiff-Trustee provided advice and instructions to Defendant-Debtor how to cure the default (using Plaintiff-Trustee's advance) and then how to get the Freedom

Mortgage Loan that was the subject of the foreclosure reinstated, as well as Plaintiff-Trustee providing the services to have the Freedom Mortgage Loan actually reinstated.

◆　　The Foreclosure Cancellation Guaranty states the substance of the services being provided by Plaintiff-Trustee, consistent with the name of the Contract itself (a <u>Foreclosure</u> <u>Cancellation</u> Guaranty)which was created by Plaintiff-Trustee and his attorney, are those of a Foreclosure Consultant to:

- "stop or postpone the foreclosure sale,"
- "obtain any forbearance from any beneficiary or mortgagee,"

- obtain any extension of time for Defendant-Debtor to reinstate the loan by curing the default,

- "obtain [a] waiver of an acceleration clause,"

- "assist [Defendant-Debtor] to obtain a loan or advance of funds," and

- "save the [Defendant-Debtor's] Residence from foreclosure."

*See*, Cal. Civ. § 2945.1(a)(1), (2), (4), (5), (6), and (8).

In multiple ways these each hit squarely within the services of a Foreclosure Consultant as defined under California Law and subject to the provisions of California Civil Code § 2945 - 2945.11.

**Statutory Disclosures of a Foreclosure Consultant Made by Plaintiff-Trustee in the Contract**

In addition to the plain language in the Foreclosure Cancellation Guaranty and the irrefutable statement by Plaintiff-Trustee in the Contract that he is a "foreclosure consultant" (the Foreclosure Cancellation Terms expressly estopping denial of that express statement therein), the Foreclosure Cancellation Guaranty itself includes notifications and cancellation forms required only of a Foreclosure Consultant. These notices in the Foreclosure Cancellation Guaranty expressly reference the California Civil Code Sections which required foreclosure consultants to make such disclosures or provide specified forms to consumers whose residences are in foreclosure.

The first is on Page 1 of the Contract in a box right under the title "**FORECLOSURE CANCELLATION GUARANTY**" (emphasis in original), which states:

///

///

1

2

3

4

> Name and address of the [Plaintiff-Trustee] to which Cancellation notice may be mailed is
> FIRST TRUST, Carl Dexter, Trustee P.O. Box XXXX, Sacramento, CA 95851
> The date the owner signed the contract is 10 February 2020.
>
> CC § 2945.3(d)

5   Contract, Page 1; Exhibit 2 (P.O. Box number redacted by the court).

6         California Civil Code § 2945.3(e), which prior to 2008 was California Civil Code § 2945(d),[7]

7   expressly requires the Foreclosure Consultant to put this exact notice specifying the name and

8   address of the Foreclosure Consultant on the first page of the contract between the Foreclosure

9   Consultant and the consumer homeowner.  As discussed herein, Plaintiff-Trustee could provide no

10  credible explanation as to why this statutory disclosure by a Foreclosure Consultant was

11  made by Plaintiff-Trustee in the Foreclosure Cancellation Guaranty if Plaintiff-Trustee was

12  not a Foreclosure Consultant.

13        Next, on Page 7 of the Foreclosure Cancellation Guaranty Plaintiff-Trustee provides the

14  following notices:

15

16

17

18

19

20

21

22

> ### NOTICE REQUIRED BY CALIFORNIA LAW
> First Trust, Carl Dexter, Trustee, or anyone working for them CANNOT
> (1) Take any money from you or ask you for money until First Trust, Carl
> Dexter, Trustee [Plaintiff-Trustee] has completely finished doing everything they said they
> would do; and
> (2) Ask you to sign or have you sign any lien, deed of trust, or deed.
>
> CC § 2945(3)(b)
>
> You, the owner, may cancel this transaction at any time prior to midnight of the
> third business day after the date of this transaction.  See the attached notice of
> cancellation form for an explanation of this right.
>
> CC § 2945.3(c)

23

24        The first notice above, for which California Civil Code § 2945(3)(b) is referenced by

25  Plaintiff-Trustee in the Foreclosure Cancellation Guaranty prepared by Plaintiff-Trustee and his

26

27

28

_____

   [7] Cal. Civ. § 2945.3 amended in 2008 to add a new paragraph (d) and renumber prior existing
paragraph (d) as current paragraph § 2945.3(e).   2008 Cal Stats. ch. 278, AB 180.

attorney, is word for word the Notice required to be given by a Foreclosure Consultant. It is also placed immediately before the second notice, for which California Civil Code § 2945.3(c) is cited,[8] that must be given by a Foreclosure Consultant. The second notice is the word for word exact notice **required by statute**, currently California Civil Code § 2945.3(d), **to be given by a Foreclosure Consultant**.

On Pages 8 and 9 of the Foreclosure Cancellation Guaranty, in duplicate, are Notice of Cancellation Forms. This is the statutory Notice of Cancellation Form, **which must be provided** in duplicate **by a Foreclosure Consultant** as required by California Civil Code § 2945.3(f). The only difference is that it states that the cancellation must be made in three business days, while § 2945.3(f) states that the consumer homeowner has five business days. The three business days notice was changed to five business days and this section, formerly § 2945.3(e) was renumber § 2945.3(f) with the 2008 amendments to California Civil Code § 2945.3. 2008 Cal Stats. ch. 278, AB 180.

The Foreclosure Cancellation Guaranty prepared by Plaintiff-Trustee and Plaintiff-Trustee's attorney provides the required notices and cancellation forms required only of a Foreclosure Consultant, not a "mere" real estate investor.

Plaintiff-Trustee's testimony that he and First Trust are merely real estate investors is not supported by the evidence presented by Plaintiff-Trustee, as well as the evidence presented by Defendant-Debtor. From the evidence presented, Plaintiff-Trustee and an attorney set up the Foreclosure Cancellation Guaranty for Plaintiff-Trustee to engage in the business of a Foreclosure Consultant as regulated by California Law. At some point, Plaintiff-Trustee concluded that it would be more lucrative to assert that he was not a Foreclosure Consultant and extract more than the 10% interest on monies advanced consumers who were facing foreclosure on their residences.

Plaintiff-Trustee and First Trust are Foreclosure Consultants as provided for in California Law, subject to the restrictions, limitations, and obligations provided in Title 14, Article 1.5 of the

---

[8] As part of the 2008 amendments, paragraph (c) of § 2945.3 was renumbered as § 2945.3(d). 2008 Cal Stats. ch. 278, AB 180.

California Civil Code. On its face, the plain language of the title of the Contract, "Foreclosure Cancellation Guaranty" states that it relates to services being provided to cancel a foreclosure sale. It goes even further, stating that the "Cancellation" is a "Guaranty." For desperate consumer homeowners facing the loss of their home, they clearly would read this as an expert Foreclosure Consultant riding in to save the day and the loss of their home, or equity in their home, to foreclosure.

The Foreclosure Cancellation Guaranty, to the extent that it purports to extract 50% of the equity of the property from Defendant-Debtor, along with the $39,705.53 advanced, in consideration for Plaintiff-Trustee making the $39,705.53 violates California law and is not enforceable as it seeks to extract compensation in excess of that allowed pursuant to California Civil Code § 2945.4 – which precludes a Foreclosure Consultant receiving any "fee, interest, or any other compensation for any reason" in excess of 10% per annum of any loan which the Foreclosure Consultant may make to Defendant-Debtor.

### DETERMINATION OF RIGHTS, INTERESTS, AND OBLIGATIONS OWING BY THE PARTIES TO THE OTHER

Plaintiff-Trustee first seeks the court determine the rights of the parties under the Foreclosure Cancellation Guaranty (Declaratory Relief) and to determine that any obligation owed Plaintiff-Trustee by Defendant-Debtor is nondischargeable based on fraud as provided in 11 U.S.C. § 523(a)(2)(A).

Plaintiff-Trustee expressly requests that the court declare that Plaintiff-Trustee owns 50% of the Net Proceeds from the sale of Defendant-Debtor's Residence as part of the compensation for the services provided by Plaintiff-Trustee under the Foreclosure Cancellation Guaranty.

**Determination of Claims For:**

**(1) The Amount of Obligation and Right to 50% of the Net Sales Proceeds from Defendant-Debtor's Residence,**

**(2) Validity of Deed of Trust Securing the Obligation for Loan.**

The evidence presented is that Plaintiff-Trustee has advanced $39,705.53 pursuant to the Foreclosure Cancellation Guaranty. $37,000.00 was advanced to stop the foreclosure sale, cure the

default, extend the period that Defendant-Debtor had to cure the default, obtain a waiver of the acceleration of the obligation secured by Defendant-Debtor's residence, and the advance of funds were to save the Defendant-Debtor's residence from foreclosure. The additional $2,705.53 were for inspections, fencing, and miscellaneous items for what Plaintiff-Trustee believed to be the sale of the Defendant-Debtor's Residence pursuant to the terms of the Foreclosure Cancellation Guaranty.

Plaintiff-Trustee has established that Defendant-Debtor owes Plaintiff-Trustee $39,705.53 for monies loaned, with prejudgement contractual interest of Zero Percent (0.00%). Plaintiff-Trustee has not requested prejudgement interest in the Complaint or as presented at Trial. Plaintiff-Trustee has not provided the court with any contractual or statutory basis for prejudgement interest.

Plaintiff-Trustee is granted judgment determining that the amount of $39,705.53 is owed by Defendant-Debtor for the monies advance (loaned) for and to Defendant-Debtor pursuant to the Foreclosure Cancellation Guaranty and that the contractual interest rate for such monies advanced (loaned) is 0.00% per annum. As stated below, this obligation is secured by the Deed of Trust granted by Defendant-Debtor pursuant to the Foreclosure Cancellation Guaranty.[9]

**Amount of Obligation - Plaintiff-Trustee Has No Right**
**to Recover Any Amounts in Excess of the $39,705.53 Loan, and**
**No Right to 50% of the Equity in the Residence**

As discussed above, the sum total of consideration/services to be provided by Plaintiff-Trustee was contractually limited to loaning the monies to cure the default in the loan secured by Defendant-Debtor's Residence and then additional amount for necessary repairs for Defendant-Debtor's Residence to be promptly sold

For the $39,705.53 (which includes repair amounts) loaned, Plaintiff-Trustee asserts not only the right to be repaid the $39,705.53, but also asserts the right to additional compensation/payment of $90,220.47 for having made the loan to stop the foreclosure sale.

For the sale of Defendant-Debtor's Residence, the Foreclosure Cancellation Guaranty,

---

[9] The Complaint as drafted requests the court to resolve the dispute of the amount that is owed and that the Deed of Trust is valid and enforceable. The Plaintiff-Trustee has not sought to have a monetary judgment entered which would replace the Foreclosure Cancellation Guaranty and Deed of Trust.

paragraph 5(b), provides that the Residence is to be listed for sale within sixty (60) days of February 11, 2020.  For the residential real estate market in 2020, it is not unreasonable to project that such a sale would be completed in four months.

To be conservative, the court will use six months for closing, which includes the two months prior to the listing date that the advance (loan) was actually made.  Plaintiff-Trustee getting paid the additional $90,220.47 for the $39,705.53 of monies loaned by Plaintiff-Trustee for a period of eight (8) months results in Plaintiff-Trustee receiving "any fee, interest or other compensation" which exceeds ten (10)% per annum of the amount of the loan.  Cal. Civ. § 2045.4(b).  Claiming the right to an additional $90,220.47, in additional to the principal of $39,705.53 loaned for eight (8) months, would be an additional 339% per annum "charge, . . . fee, interest, or any other compensation for any reason" monies sought to be received by Plaintiff-Trustee for the loan and Foreclosure Consultant services provided to/for Defendant-Debtor to cure the default in and reinstate the Freedom Mortgage Loan. This is in violation of California Civil Code § 2945.4(b).[10]

Plaintiff-Trustee seeking to recover additional compensation for the services as a Foreclosure Consultant in an amount equivalent to a 339% per annum interest in addition to the amounts advanced (loaned) is barred as a matter of California Law.

Additionally, trying to claim having acquired by virtue of the Foreclosure Cancellation Guaranty a joint venture interest in Defendant-Debtor's Residence and the right to 50% of the equity in the Residence is in clear violation of California Civil Code § 2945.4, which states (emphasis added):

§ 2945.4. Violations

It shall be a violation for a foreclosure consultant to:
> . . .
>
> (c) Take any wage assignment, any lien of any type on real or personal property, or other security to secure the payment of compensation. That **security shall be void and unenforceable**.

---

[10] To "show the work" for computation of the per annum interest rate, court computes as follows:

$39,705 loan x 339% interest per annum interest for which the interest and principal are paid in full in 8 months (8/12 months  = .67) x .67 = $90,181.97.

. . .

(e) Acquire **any interest in a residence** in foreclosure from an owner with whom the foreclosure consultant has contracted.  Any interest acquired in violation of this subdivision **shall be voidable**, . . . .

Thus, pursuant to Plaintiff-Trustee's request for the court to declare what interests, whether lien or joint venture ownership (legal or equitable), results in the court determining that:

(1) any lien on Residence for compensation for amounts in excess of the loan obligation is void and

(2) any interest in Defendant-Debtor's Residence, including claiming a contractual right to 50% of the Net Proceeds from the sale of the Residence, is voidable – the statute expressly stating that such interest <u>shall</u> <u>be</u> <u>voidable</u>, not merely *may be voidable*  based on a series of possible factors or equitable issues.

Asserting such right to amounts in excess of the loans made and any interests in Defendant-Debtor's Residence (whether legal or equitable), in the proceeds of the sale of the Defendant-Debtor's residence, are void (for any lien) and shall be voidable (for an interest in Defendant-Debtors Residence).

The court further finds that the terms of the Foreclosure Cancellation Guaranty, and considering all of the testimony and evidence presented, do not grant Plaintiff-Trustee any interest (neither legal nor equitable) in Defendant-Debtor's Residence or the proceeds from the sale of such Residence.

The "joint venture" provisions in the Foreclosure Cancellation Guaranty, consisting of two lines of text in paragraph 5(e), state that in consideration of the Foreclosure Cancellation Guaranty (in addition to repaying the monies advanced) "[Defendant-Debtor] and [Plaintiff-Trustee enters into a **JOINT VENTURE WITH A 50/50 SPLIT OF NET PROCEEDS**." Exhibit 2 (emphasis in original).  No other reference is made to a "joint venture" anywhere in the Foreclosure Cancellation Guaranty.

As stated above, with respect to Plaintiff-Trustee's obligations under the Foreclosure Cancellation Guaranty, they were limited to "cure the below described defaults [stated to be ($37,000) default in the Freedom Mortgage Loan] and reinstate the [Freedom Mortgage Loan]."

Foreclosure Cancellation Guaranty fourth WHEREAS paragraph, p. 2; Exhibit 2. There was nothing other than providing the services of a Foreclosure Consultant for any asserted "joint venture" with Defendant-Debtor.

Paragraph 5(e) begins with stating that from the net sales proceeds from the sale of Defendant-Debtor's Residence that was in foreclosure, Plaintiff-Trustee will be paid the amounts advanced (loaned) with 0% interest and a 50/50 split of the net sales proceeds. This provides for payment of the monetary obligations owed by Defendant-Debtor under the Foreclosure Cancellation Guaranty, which obligations are secured by the Deed of Trust. The words "Joint Venture" do not appear to relate to any actual joint venture. Rather, they appear to be camouflage to create the appearance that California Law governing Plaintiff-Trustee's activities as a Foreclosure Consultant should not apply to additional compensation (here equal to 339% per annum interest on the monies loaned) that Plaintiff-Trustee seeks for the loan made under the Foreclosure Cancellation Guaranty.

As with much of Plaintiff-Trustee's testimony, no credible testimony or evidence was given of there being any actual joint venture. Rather, using the words "joint venture" was a canard for Plaintiff-Trustee to take additional compensation of $90,220.47 (50% of the equity in the Residence) for having made a projected eight (8) month $39,705.53 loan.

It is unclear what consideration that Plaintiff-Trustee provided for any joint venture. Plaintiff-Trustee has only made a loan to the Defendant-Debtor to cure the default on the obligation secured by the Residence. For this, the Plaintiff-Trustee asserts not only to be repaid the loan, but an additional amount that equals 339% per annum interest on the monies loaned. It is also unclear what personal liabilities, obligations, and fiduciary duties Plaintiff-Trustee would incur if there was an actual, *bona fide* joint venture.

With respect to any asserted joint venture, it is nothing more than Plaintiff-Trustee and his attorney(s) having inserted those two words into one line of the Foreclosure Cancellation Guaranty, as if they provide a magical legal incantation, to allow Plaintiff-Trustee a facade to demand additional payments/compensation/interest from the less sophisticated Defendant-Debtor that equals 339% per annum interest on the $39,705.53 advance (loan) made by Plaintiff-Trustee, which advance (loan) was the only contractual obligation of Plaintiff-Trustee under the Foreclosure

Cancellation Guaranty.

Defendant-Debtor is granted judgment determining that Plaintiff-Trustee is not entitled to any monetary amounts in excess of the $39,705.53. Further, that Plaintiff-Trustee does not have a legal basis for asserting a right to 50% of the sales proceeds from a Sale of Defendant-Debtor's Residence. Additionally, that Plaintiff-Trustee does not have any interest, neither legal nor equitable, in Defendant-Debtor's Residence or the proceeds from the sale of such Residence.

**Validity of Deed of Trust**

Though no deed of trust was included with the Foreclosure Cancellation Guaranty, both Plaintiff-Trustee and Defendant-Debtor testified that the Deed of Trust (Exhibit 4) dated March 16, 2020, was executed by Defendant-Debtor as the Deed of Trust to secure the obligation of Defendant-Debtor owning on the Foreclosure Cancellation Guaranty.

Though the Deed of Trust states that it is to secure a "promissory note of the same date executed by [Defendant-Debtor], in the sum of $75,000.00," no such Note was presented to the court by the Plaintiff-Trustee. From the evidence presented the court concludes that the obligation it secures is the $39,705.53 owed by Defendant-Debtor pursuant to the Foreclosure Cancellation Guaranty and the reference to a $75,000.00 Note was a mere "drafting error" by Plaintiff-Trustee.

At the trial, when Plaintiff-Trustee was questioned about why the Deed of Trust he prepared for Defendant-Debtor to sign referenced a $75,000.00 promissory note but no such note was entered into evidence, Plaintiff-Trustee seemed surprised. After stumbling a bit, Plaintiff-Trustee stammered that the Foreclosure Cancellation Guaranty was really part promissory note and part joint venture agreement. No legal theory was advanced as to how the Foreclosure Cancellation Guaranty was a "promissory note." This testimony of Plaintiff-Trustee was not credible, sounded in the nature of trying to circumvent the law, and was not supported by any other evidence or legal arguments presented by or for Plaintiff-Trustee.

This testimony of Plaintiff-Trustee is consistent with much of his testimony that the court does not find credible. Much of it relates to Plaintiff-Trustee's legal conclusions about why he is entitled to the additional compensation of $90,220.47, which equals 339% per annum interest for the $38,705.53 monies loaned. It is testimony "created" to allow Plaintiff-Trustee to try and justify

taking away 50% of the Defendant-Debtor's equity in his Residence that was in foreclosure.

The Foreclosure Cancellation Guaranty provides that Defendant-Debtor is to repay the monies advanced when the residence Property is sold. That has not yet occurred.

Judgment shall be entered for Plaintiff-Trustee that the deed of trust encumbering the 2 Odom Court, Sacramento, California; recorded on March 17, 2020, with the Sacramento County Recorder, Doc # 202003171009; to secure the obligation of $39,705.53 of Defendant-Debtor to Plaintiff pursuant to the Foreclosure Cancellation Guaranty, which judgment shall expressly state that the contractual interest rate on the obligation is 0.00% interest per annum, and such obligation is valid and enforceable.

**No Prejudgment Interest Requested by or**
**Legal Basis Shown by Plaintiff-Trustee on the**
**$39,705.53 Obligation Secured by the Deed of Trust**

In the Complaint no request is made by Plaintiff-Trustee for any prejudgment interest. In Plaintiff-Trustee's Trial Brief (Dckt. 47), no request is made for there being interest accruing on any obligation.

The Foreclosure Cancellation Guaranty; paragraph 5(e), Exhibit 2; expressly states that the loan made by Plaintiff-Trustee in the amount of $39,705.53 has an interest rate of "**ZERO** percent (0.00%) per annum . . . until date said monies are actually returned to the [Plaintiff-Trustee]; . . ." (Emphasis in original.) The contractual interest rate for the $39,705.53 loan is 0.00% per annum.

Plaintiff-Trustee has not provided the court with any other contractual provision or any statutory basis for interest accruing on the obligation for any amount in excess of the contractual 0.00% or for the court entering a judgment determining that any interest is owing or accruing on the $39,705.53 loan.

California Civil Code § 3289 expressly addresses the issue of the application of a contractual interest rate and it continuing until a judgment is entered that replaces the underlying contract.

§ 3289. Rate of interest chargeable after breach of contract

(a) Any legal rate of interest stipulated by a contract remains chargeable after a breach thereof, as before, until the contract is superseded by a verdict or other new obligation.

1    (b) If a contract entered into after January 1, 1986, does not stipulate a legal rate of
     interest, the obligation shall bear interest at a rate of 10 percent per annum after a
2    breach.

3    For the purposes of this subdivision, the term contract shall not include a note
     secured by a deed of trust on real property.
4

5    Cal. Civ. § 3289.

6        As stated above, the contract rate of interest continues until it is superceded by the verdict

7    (judgment). *See Resolution Trust Corp. V. First American Bank*, 144 F.3d 1126, 1129 (9th Cir.

8    1998, stating, "Further, the statutory rate [Cal. Civ. 3289 amended in 1995 to add paragraph (b) for

9    statutory interest when the contract does not specify an interest rate] does not apply at all to accrued

10   prejudgment interest if a rate was specified in the contract." Here, the rate of interest set forth in the

11   Foreclosure Cancellation Guaranty of 0.00% is not an illegal rate of interest (*i.e.* it does not violate

12   any statute or the California Constitution to which parties may agree to in a contract). *See Cavalry*

13   *SPV I, LLC v. Watkins*, 36 Cal. App. 5th 1070, 1092-1094 (2019), which discussion by the

14   California Court of Appeal includes:

15
        The plain language of section 3289 indicates that subdivision (a) applies when a
16      contract contains a legal rate of interest, and the contractual rate agreed upon by the
        parties in the contract governs following a breach in such cases. . .Put another way,
17      if the creditor entered into a contractual agreement containing a legal rate of interest,
        it remains bound by the terms of that agreement; . . .
18      . . .
        Further, this interpretation is also consistent with other California cases
19      interpreting section 3289 in slightly different contexts. As already discussed, the
        Ninth Circuit in *Diaz* addressed a case in which the original contract did not include
20      an interest provision and concluded subdivision (b) was applicable "given the
        absence of any provision in the contract stipulating to a particular rate of interest."14
21      (*Diaz, supra*, 785 F.3d at p. 1330, italics added.) Similarly, in *Mark McDowell Corp.*
        *v. LSM 128* (1989) 214 Cal.App.3d 1427, the court decided that a party to a contract
22      with a usurious interest rate could still collect prejudgment interest at the statutory
        rate pursuant to section 3289, subdivision (b) because the usurious nature rendered
23      the contractual interest provision void, such that the contract did not specify a legal
        rate of interest. (*McDowell*, at pp. 1431–1432, abrogated on other grounds in
24      *Southwest Concrete Products v. Gosh Construction Corp.* (1990) 51 Cal.3d 701,
        704.) Finally, in *Reidy v. Miller* (1927) 85 Cal.App. 764, 768, the court considered
25      a situation in which the contractual rate of interest was less than the statutory 10
        percent and concluded the plaintiff was entitled only to the lower contractual rate.
26      In each of these cases, the presence or absence of a contractual rate of interest
        controlled whether the creditor could rely on the statutory rate of 10 percent set forth
27      in section 3289, subdivision (b).

28   ///

Judgment shall be entered for Defendant-Debtor and against Plaintiff-Trustee that there is no interest owning on the $39,705.53 loan obligation, with the contractual interest rate being 0.00% per annum for said obligation.

**Obligation is Dischargeable**

Plaintiff-Trustee asserts that the obligations owed by Defendant-Debtor are nondischargeable due to Defendant-Debtor's fraud. The fraud asserted is that Defendant-Debtor never intended to perform any of the terms agreed to in the Foreclosure Cancellation Guaranty, including: (1) reimbursing Plaintiff-Trustee for the $39,705.53 advanced, (2) allowing Plaintiff-Trustee to renovate the Defendant-Debtor's residence for sale so Plaintiff-Trustee could receive 50% of the sales proceeds (after repayment of the $39,705.53 advanced), (3) list the residence for sale, (4) sell the residence, and (5) give Plaintiff-Trustee 50% of the sales proceeds (after repayment of the $39,705.53 advanced) as additional compensation for the monies advanced (loaned) pursuant to the Foreclosure Cancellation Guaranty.

The basic grounds for nondischargeable fraud are well established and with respect to what is alleged, fairly common to the court.

Congress provides in 11 U.S.C. § 523(a)(2)(A) that debts which are based upon fraud will be nondischargeable. For "traditional fraud," the creditor is required to establish the following five elements:

> (1) the debtor made . . . representations;
>
> (2) that at the time he knew they were false;
>
> (3) that he made them with the intention and purpose of deceiving the creditor;
>
> (4) that the creditor justifiably relied on such representations; [and]
>
> (5) that the creditor sustained the alleged loss and damage as the proximate result of the misrepresentations having been made.

*In re Sabban*, 600 F.3d 1219, 1222 (9th Cir. 2010). A creditor must show these elements by a preponderance of evidence. *In re Slyman*, 234 F.3d 1081, 1085 (9th Cir. 2000). 11 U.S.C. § 523(a)(2)(A) prevents the discharge of all liability arising from fraud. *Cohen v. de la Cruz,* 523

U.S. 213, 215 (1998).

The requirement of "justifiable reliance" looks to the qualities and characteristics of the particular plaintiff and the circumstances of the particular case. *Field v. Mans*, 516 U.S. 59, 71 (1995); *In re Kirsh*, 973 F.2d 1454, 1458 (9th Cir. Cal. 1992). The standard for determining whether reliance is justifiable "is not that of the average reasonable person. It is a more subjective standard which takes into account the knowledge and relationship of the parties themselves." *In re Kirsh,* 973 F.2d at 1458 (9th Cir. Cal. 1992). "The standard does protect the ignorant, the gullible, and the dimwitted. . . ." *Id*.

As addressed herein, Plaintiff-Trustee's attempt to obtain an interest in Defendant-Debtor's Residence for the services monies advanced under the Foreclosure Cancellation Guaranty is illegal and any such interests are void or shall be voidable.  Cal. Civ. §§ 2945.4.

As noted by the Supreme Court in *Husky Int'l Elecs., Inc. v. Ritz*, 136 S. Ct. 1581 (2016), the term "actual fraud" as used in 11 U.S.C. § 523(a)(2) includes fraudulent conveyance schemes that would not include a "representation," but are fraudulent under applicable nonbankruptcy law.  No such statutory fraud basis has been asserted by Plaintiff-Trustee.

As shown at trial, the Parties contractual relations were a "mess," and the rights, amounts and interests demanded/imposed by Plaintiff-Trustee in the Foreclosure Cancellation Guaranty drafted by Plaintiff-Trustee and his attorney are in large part barred by California Law.  Though Defendant-Debtor's conduct in addressing his financial obligations on the Freedom Mortgage Loan has been less than financially planning stellar, it does not rise to actionable fraud for the nondischargeability of debt.

The Defendant-Debtor did what he legally promised to do under the Foreclosure Cancellation Guaranty - give Plaintiff-Trustee the Deed of Trust to secure the monetary obligation owed pursuant to the Foreclosure Cancellation Guaranty.

The court also notes that the Foreclosure Cancellation Guaranty, which was drafted by Plaintiff-Trustee and his attorney, expressly states that Defendant-Debtor can enforce his right of foreclosure if this less sophisticated consumer Defendant-Debtor should hesitate with the sale of the Residence starting two months after February 10, 2023.  Plaintiff-Trustee was not relying on any

"promised performance" under the Foreclosure Cancellation Guaranty.

With respect to the alleged misrepresentation, the court first notes that Plaintiff-Trustee was demanding that Defendant-Debtor pay Plaintiff-Trustee amounts well in excess of that permitted under California Law for services provided by Plaintiff-Trustee as a Foreclosure Consultant under the Foreclosure Cancellation Guaranty. Defendant-Debtor's refusal to move forward with a sale of the residence property and turn over 50% of the net proceeds to Plaintiff-Trustee was warranted. Defendant-Debtor had *bona fide*, good faith reasons based on California law for rejecting Plaintiff-Trustee's demands for the immediate sale of the Residence and Plaintiff-Trustee taking 50% of the net proceeds.

Second, the evidence clearly shows that Plaintiff-Trustee was not relying on any representations made by Defendant-Debtor. On the eve of the foreclosure sale, Plaintiff-Trustee gave his "take it or leave it" Foreclosure Cancellation Guaranty to Defendant-Debtor to sign. The terms are very harsh, some now determined to be unenforceable as a matter of California Law, and clearly drawn to give the appearance that Plaintiff-Trustee has the power to enforce a sale of Defendant-Debtor's Residence, with or without the cooperation of Defendant-Debtor, so Plaintiff-Trustee can take half of the Net Proceeds from the sale of the Residence.

Plaintiff-Trustee was not relying on any "representations" made by Plaintiff-Trustee, but had the Foreclosure Cancellation Guaranty drafted by his attorney to allow Plaintiff-Trustee to dictate and control the terms for the liquidation of Defendant-Debtor's Residence.

Though the less sophisticated consumer Defendant-Debtor waited until the last minute before seeking the assistance of Plaintiff-Trustee, that does not give Plaintiff-Trustee the license to violate California Law, have a contract written that states unenforceable and void provisions, and then complain that the less financially sophisticated consumer Defendant-Debtor somehow has committed fraud when Defendant-Debtor fails to capitulate to void any illegal provisions written into the Foreclosure Cancellation Guaranty by Plaintiff-Trustee and his attorney.

The court notes that a month after the Foreclosure Cancellation Guaranty was signed, Defendant-Debtor executed the Deed of Trust securing the obligations owed to Plaintiff-Trustee. Defendant-Debtor continued to perform under the Foreclosure Cancellation Guaranty giving the lien

on the Residence Property for which there is substantial equity well in excess of even the excessive, improper, not legally allowed amounts that Plaintiff-Trustee claimed. Defendant-Debtor, as shown by the evidence, did work to fulfill his legally enforceable obligations under the Foreclosure Cancellation Guaranty.

The court finds that:

(1) Defendant-Debtor did not make any false representations;

(2) There were no representations made by Defendant-Debtor that were made with any intention or purpose to deceive Plaintiff-Trustee;

(3) There were no representations that were false upon with Plaintiff-Trustee justifiably relied; and

(4) There have been no damages sustained by Plaintiff-Trustee for any misrepresentation by Defendant-Debtor.

The court determines that there were no representations relied upon by Plaintiff-Trustee relating to any legally enforceable rights or interests of Plaintiff-Trustee.

The one representation justifiably relied upon by Plaintiff-Trustee for which relief is requested is that Defendant-Debtor would grant the Deed of Trust. The Defendant-Debtor fulfilled this representation with the Deed of Trust executed on March 16, 2020 – notwithstanding that Plaintiff-Trustee did not provide the Deed of Trust to Defendant-Debtor until two full months after the Foreclosure Cancellation Guaranty was executed and the monies advanced (loaned) to cure the default in the obligation secured by Defendant-Debtor's residence. Contrary to Plaintiff-Trustee's assertion of misrepresentation, Defendant-Debtor fulfilled the promised obligation by promptly executing the Deed of Trust, even though it was presented one month after the monies had been loaned by Plaintiff-Trustee and the benefit thereof was already received by Defendant-Debtor.

Thus, there are no damages that Plaintiff-Trustee has suffered due to any asserted "fraud." Rather, Plaintiff-Trustee was given the "keys to the financial kingdom" to enforce his rights as Defendant-Debtor agreed to do in the Foreclosure Cancellation Guaranty.

Based on the evidence provided, the court concludes that when the Foreclosure Cancellation Guaranty was signed, Defendant Debtor did not make any representations he knew to be false and did not make any representations with the intention of deceiving Plaintiff-Trustee.

The court shall enter judgment for Defendant-Debtor and against Plaintiff-Trustee for the determination that the obligations arising under the Foreclosure Cancellation Guaranty are not nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(A).

## JUDGMENT TO BE ENTERED

The court shall enter a judgment granting the following relief:

A.      Judgment is granted for Plaintiff-Trustee and against Defendant-Debtor determining that the amount of $39,705.53 is owed by Defendant-Debtor for the financial obligations of Defendant-Debtor to Plaintiff-Trustee pursuant to the Foreclosure Cancellation Guaranty as of the entry of the Judgment.

B.      Judgment is granted for Defendant-Debtor and against Plaintiff-Trustee determining that Plaintiff-Trustee is not entitled to any monetary amounts in excess of $39,705.53 pursuant to the Foreclosure Cancellation Guaranty. The court is not now making a determination of any fees, costs, expenses, or additional recoverable amounts pursuant to the Foreclosure Cancellation Guaranty and applicable California Law that either Plaintiff-Trustee or Defendant-Debtor may seek by post-judgment motion or further proceeding.

C.      Judgment is granted for Defendant-Debtor and against Plaintiff-Trustee determinating that Plaintiff-Trustee does not have a legal basis for asserting any interest in or a right to 50% (or any portion) of the sales proceeds from a sale of Defendant-Debtor's Residence. Additionally, that Plaintiff-Trustee does not have any interest, neither legal nor equitable, in Defendant-Debtor's Residence or the proceeds from the sale of such Residence.

D.      Judgment is granted for Plaintiff-Trustee and against Defendant-Debtor determining that the Deed of Trust encumbering 2 Odom Court, Sacramento, California; recorded on March 17, 2020, with the Sacramento County Recorder, Doc # 202003171009; which secures the obligation determined by the judgment of $39,705.53, and any fees, costs, expenses, and additional recoverable amounts pursuant to the Foreclosure Cancellation Guaranty and applicable California Law

42

Plaintiff-Trustee may seek by post-judgment motion, owed by Defendant-Debtor to Plaintiff-Trustee pursuant to the Foreclosure Cancellation Guaranty, is valid and enforceable.

E.       Judgment is granted for Defendant-Debtor and against Plaintiff-Trustee determining that pursuant to the express language of the Foreclosure Cancellation Guaranty, ¶ (5)(e), the rate of interest for monies advanced or loaned pursuant thereto is 0.00% per annum, with the Foreclosure Cancellation Guaranty expressly stating that the 0.00% interest rate is for that obligation for the period "from the date said monies are paid out by the [Plaintiff-Trustee] and until date said monies are actually returned to the [Plaintiff-Trustee]. . . ."

F.       Judgment is granted for Defendant-Debtor and against Plaintiff-Trustee determining that the obligations of Defendant-Debtor arising under the Foreclosure Cancellation Guaranty are dischargeable, and denying Plaintiff-Trustee's request for a determination of nondischargeability pursuant to 11 U.S.C. § 523(a)(2)(A).

The court does not enter any monetary judgment for Plaintiff-Trustee replacing the Foreclosure Cancellation Guaranty, the obligation owing thereunder, and the Deed of Trust. The Complaint clearly requests that the court declare the amount of the obligation owing to Plaintiff-Trustee and that such obligation is secured by the Deed of Trust. This is a proper request for Declaratory Relief as provided for in 28 U.S.C. § 2201, for the court to determine the actual controversy between Plaintiff-Trustee over the existence and enforceability of the Deed of Trust and the amount of the obligation secured by the Deed of Trust. See *Calderon v. Ashmus*, 523 U.S. 740, 745 (1998); *Societe de Conditionnement v. Hunter Eng. Co., Inc.*, 655 F.2d 938, 943 (9th Cir. 1981).

Attorney's fees, costs, and expenses as may be awarded to a prevailing party may be requested as provided in Federal Rule of Civil Procedure 54 and Federal Rule of Bankruptcy Procedure 7054 post-judgment.

The court expressly reserves, without limitation, as part of the post-judgment jurisdiction of this court, determination of any disputes concerning asserted interest, costs, and expenses added to or sought to be added to the $39,705.53 obligation, for which the court has determined that there is

0.00% interest accruing, and the amount of the obligation of Defendant-Debtor under the Foreclosure Cancellation Guaranty as of the entry of the Judgment in this Adversary Proceeding, as well as determining Plaintiff-Trustee's Claim in Defendant-Debtor's Bankruptcy Case.

The court shall prepare and enter the judgment pursuant to this Decision.

**Dated:** October 11, 2023       **By the Court**

**Ronald H. Sargis, Judge**
**United States Bankruptcy Court**

# Instructions to Clerk of Court
### Service List - Not Part of Order/Judgment

**The Clerk of Court is instructed to** send the Order/Judgment or other court generated document transmitted herewith *to the parties below*. The Clerk of Court will send the document via the BNC or, if checked ____, via the U.S. mail.

| Debtor(s) / Defendant-Debtor(s) | Attorney for the Debtor(s) / Defendant-Debtor(s) (if any) |
|---|---|
| **Bankruptcy Trustee** (if appointed in the case) | Office of the U.S. Trustee<br>Robert T. Matsui United States Courthouse<br>501 I Street, Room 7-500<br>Sacramento, CA 95814 |
| **Attorney(s) for the Trustee** (if any) | Kirk Steven Rimmer, Esq.<br>112 J Street, Ste. 300<br>Sacramento, CA 95814 |